[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 6606
FACTS
The court finds the following facts to be true.
Mechanics Savings Bank (the "Bank") entered into a loan relationship with Water Street Associates Limited Partnership ("Water Street") whose principal was Bert McTeague ("McTeague") on December 19, 1988. Pursuant to this loan relationship, the Bank loaned to McTeague's company the sum of $2,600,000.00 and took back as security, a mortgage on his two restaurant properties in Stonington, Connecticut. The restaurants, known as Harborview Restaurant and Skipper's Dock Restaurant (together, the "Restaurants"), were located at 60, 64, 66 and 68 Water Street, Stonington, Connecticut, and were owned by Water Street. They were managed by BLM Capital Investors, Inc. ("BLM") which in turn was controlled by McTeague. Harborview has been described as a long established, full service, year round restaurant serving principally French cuisine, to a local and tourist clientele. Skipper's Dock has been described as a seasonal waterfront restaurant, focusing principally on seafood and relying heavily upon the tourist and boating trade. (Tr. 5/22/96 p. 10.)
According to the testimony of John Atkinson ("Atkinson"), the Bank's workout officer, the loan relationship originally went into default in 1993, and McTeague made sporadic payments thereafter while the Bank negotiated with him to resolve the loan default or take back the Restaurants. During this time, Atkinson testified that McTeague was not paying his loan obligations, nor property taxes and was providing the Bank with little or no financial information.
In an effort to analyze the Restaurants' operations, the Bank hired Prime Consulting Group, Inc. ("Prime" and/or "Receiver") to prepare a report on the Restaurants. (Tr. 5/22/96 p. 11.)
Prime is an experienced restaurant consulting firm whose principals are Harry Carboni ("Carboni") and Frank Dwyer ("Dwyer"). Prime prepared a report to the Bank dated September, 1994 regarding its findings of the Restaurants' operations showing that they were unprofitable. (Tr. 5/22/96 p. 9, 12;Receiver's Exhibit #30.) For this service, Prime charged and was paid by the Bank the sum of $1,500 (Tr. 5/22/96 p. 21; TestimonyCT Page 6607of Dwyer.) Up to this point in time, the parties had not discussed the possibility of Prime acting as a receiver of the Restaurants. According to Atkinson, after McTeague failed to make any payments on his loan for over nine months, the Bank finally initiated the above captioned foreclosure suit returnable November 29, 1994. McTeague's Companies filed numerous pleadings contesting the foreclosure during the Winter and Spring of 1995. Atkinson described the fight between the Bank and McTeague as very "acrimonious."
After the foreclosure was commenced, the Bank requested Prime to quote a proposal for "managing" the Restaurants, which resulted in Prime submitting the February 3, 1995 letter(Receiver's Exhibit #3). Prime has presented the testimony of Carboni and Dwyer to establish that Atkinson agreed these were reasonable terms for Prime to act as a receiver of the Restaurants. (Tr. 5/22/96 pp. 14-18; Testimony Dwyer.) The Bank claims that this letter was merely the result of an inquiry as to whether Prime could manage the Restaurants, as part of a settlement with McTeague and had nothing to do with the receivership. Three days later, on February 6, 1996, the Bank filed a motion with the court to appoint Prime as Receiver of the Restaurants.
After a hearing, Judge Hadley Austin granted the Bank's motion and appointed Prime as Receiver of the Restaurants on May 17, 1995. (Court Exhibit #1.) The Court's Order:
 a. Allowed the Receiver to manage and operate the Restaurants (¶ 2.A).
 b. Authorized the Receiver to pay salaries and expenses including attorney's fees (¶ 2.K.(1)).
 c. Authorized the Receiver to pay all costs necessary to operate the Restaurants (¶ 2.K.(2) 
 d. Authorized the Receiver to accept advances from the Bank for costs and expenses (¶ 2.L).
 e. Instructed the Receiver to file weekly cash flow statements with the Court.
No one has disputed the Receiver's testimony that when it took over the Restaurants, BLM's records were in shambles. (Tr.CT Page 66085/22/96 p. 28). No aging accounts payable report had been maintained for the Restaurants, nor were there records setting forth the income, expenses and profits. This discovery substantiated Atkinson's complaint that McTeague was not providing financial data to the Bank while his loan was in default. The Receiver found that vendors and food suppliers had gone unpaid for substantial periods of time and that BLM was in arrears on payroll and payroll taxes. (Tr. 5/22/96 pp. 28-29).
Immediately upon taking over the Restaurants, the Receiver began to file weekly cash flows with the court. At no time did the Bank ever file an objection with the court as to any of the weekly cash flows submitted by the Receiver.
As the Receiver testified, it took many months to straighten out the financial turmoil of the Restaurants and get a computer system up and running that could accurately report the profits and losses. (Tr. 5/22/96 p. 65). This was done at the behest of the Bank and was not part of the Receiver's court ordered obligations.
Upon taking over the Restaurants, the Receiver discovered it could not operate them with all of the outstanding bills as vendors refused to deliver services on credit. The operation of the Restaurants was seriously jeopardized due to arrearages for advertising, utilities and payroll. The Receiver sought and obtained the permission of Atkinson and the Bank's attorneys, Berman Sable, to pay several of the outstanding obligations of BLM. (Tr. 5/22/96 pp. 29-33, 37). Judge Austin's Order (par; 2.K (2) (3)) authorized the Receiver to make decisions to pay outstanding bills. . . "necessary to operate and manage the Premises." The Bank drafted the proposed Receiver Order and once the Bank learned of the Receiver's intentions to pay old Obligations of BLM, it did not make any oral or written objection to that proposed course of action.
The Receiver proceeded to pay outstanding obligations of BLM as follows:
a. $27,000.00 worth of old vendor obligations.
 b. $45,000.00 worth of outstanding payroll and payroll taxes.
c. $21,000.00 of outstanding sale taxes.
CT Page 6609 The total amount paid for old obligations by the Receiver was $94,828.49. (Blum, Shapiro Accounting Report, Receiver's Exhibit#38, Appendix 4, pp. 3-4). The Receiver utilized the income stream from the Restaurants, existing cash on hand, and proceeds from the Bank advances to pay for these bills over the first few months of operation. Tr. 5/22/96 p. 33).
The operation of the Restaurants during the Summer of 1995 can be described as difficult. The Receiver's analysis of historical sales for the Restaurants had shown that gross sales had been in a continual decline over the last six (6) years (See chart attached to Receiver's Exhibit 14). This trend continued during the Summer of 1995. On numerous occasions, the Receiver was charging against the income stream $5,000 per week plus expenses as mentioned in the February 3, 1995 letter. (Tr.5/22/96 pp. 18, 40; Receiver's Exhibit #3, p. 2). The weekly fee of $5,000.00 was broken down to $4,000.00 per week for "Professional Fees" and $1,000.00 per week for "Salary of Manager" and is summarized with the expenses of the Receiver on Receiver's Exhibit #24.[1] (Tr. 5/22/96 p. 55). During the Summer of 1995, the fight between the Bank and McTeague continued.
In July of 1995, the Receiver filed its first Motion for Interim Approval of its activities (Pleading #173) but said Motion kept getting continued by the Bank and McTeague until it was scheduled for November 7, 1995. In October of 1995, a meeting took place between Carboni, Dwyer, Atkinson and the Bank's counsel where the receiver reported a preliminary profit/loss analysis based upon the new computer system it had installed.(Tr. 5/22/96 pp. 64, 65, 80, 89 162; Tr. 5/24/96 p. 122). This analysis evidenced a loss to date in the operation of the Restaurants of approximately $90,000.00 to $100,000.00. Atkinson denied that he was aware of this information until November or December, but he does admit that the October meeting took place. The Receiver testified through Carboni and Dwyer, that actually, the net effect of the receivership at that time had been to operate the Restaurants on a break-even basis if one took into account the $90,000.00 it was forced to pay for old BLM obligations. (Tr. 5/22/96 pp. 66-68).
Despite the disclosure of the operating loss, the Bank instructed the Receiver that it was imperative that the Restaurants remain open so as to maintain their value in conjunction with the Bank's efforts to locate a buyer. (Tr.CT Page 66105/22/96 pp. 69, 89). The Bank, through Atkinson, instructed the Receiver to prepare a marketing plan to minimize further losses.(Receiver's Exhibit #11 dated October 23, 1995). A copy of this marketing plan was forwarded to the court (Judge Austin) in anticipation of the November 7th hearing with a cover letter from the Receiver's counsel confirming that none of the parties anticipated the receivership to last so long. (Receiver's Exhibit#15). The Receiver also submitted a "Cash Flow Summary", through October 29, 1995 showing a net operating income of $14,683.00.(Receiver Exhibit #14). The receiver never had a chance to explain this to the court because the hearing upon its motions kept getting put off.
When the Receiver's Motion for Interim Approval of its accounting was scheduled before Judge Austin on November 7, 1995, McTeague's attorneys appeared with an Objection in hand making allegations of impropriety on the part of the Receiver. The Bank's attorneys responded that the Receiver was doing the best job possible under the circumstances. (Receiver's Exhibit #12).
Due to BLM's objection, the hearing on the Motion for Receiver was continued again.[2] The ultimate result of the November hearing was additional bad press about the Restaurants causing a further downturn in the Restaurants' business and a cancellation of many previously-booked events. (Receiver'sExhibit #26; Tr. 5/22/96 p. 70). This resulted in November being a very poor month over and above the anticipated seasonal downturn normally expected. (Tr. 5/22/96 p. 59).
The Receiver's marketing plan was presented to the Bank at a follow-up meeting that took place in November, 1995 (according to the Receiver) or early December, 1995 (according to Atkinson). Present were Carboni, Dwyer, Atkinson, the attorneys for the Bank and the Receiver. At this meeting, the marketing plan (Receiver Exhibit 11) and the recent developments resulting in the disastrous November were discussed by the participants. (Tr.5/22/96 pp. 19-20). The Receiver estimated another net $60,000.00 minimum loss if the Restaurants stayed opened throughout the winter to which Atkinson objected and requested the Receiver to prepare another report identified as Receiver's Exhibit #16. (Tr.5/22/96 pp. 80, 136). [Also at this meeting, Attorney William Shure, on behalf of the Receiver, recommended that they must stay open because they maintained more value to a potential buyer if they were kept open. (Tr. 5/24/96 pp. 122-124).
CT Page 6611
The Receiver testified that the Bank was adamant that the Restaurants remain open even after reviewing the Receiver's list of options. (Receiver's Exhibit #16).
Finally, in December of 1995, due to the extremely poor amount of business, the Receiver first consolidated the income of Skipper's Dock with that of Harborview (Tr. 5/23/96 p. 59; Tr.5/24/96 p. 46) and then proceeded to close the Skipper's Dock Restaurant entirely. It also threatened to close the Harborview Restaurant as well if the Bank continued to insist that the Restaurants stay open but failed to fund their deficit.(Receiver's Exhibit #18; Tr. 5/22/96 p. 95). In response to this, the Bank required that at least Harborview stay open and advanced the Receiver $18,000.00 towards its outstanding fees as well as additional working capital to fund the deficit in the operations.(Receiver's Exhibits #6 and #7; Tr. 5/22/96 p. 97).
Eventually, in January of 1996, a fire at the Harborview Restaurant forced its closure. (Tr. 5/22/96 p. 98). Vendors had continued to supply the Restaurant up until the point it was closed. This situation was reported to Judge Austin in Receiver's Exhibit #20, along with the joint decision of the Bank and the Receiver to close Harborview due to the fire. The Receiver continued to expend a substantial amount of personnel time and effort inspecting the property regularly and dealing with issues pertaining to fire damage, employees, taxes, vendors, accounting, etc., after the two restaurants were closed. (Tr. 5/22/96 p. 134;Tr. 5/23/96 p. 2 Testimony of Dwyer).
As a result of the unexpected demise of McTeague, the Bank entered into settlement negotiations with his estate. This resulted in a settlement wherein a judgment of strict foreclosure was entered in favor of the Bank on February 21, 1996. As part of that judgment, Judge Hendel made a finding that the Restaurant properties had a fair market value of $2.1 million dollars (Judicial Notice taken of Court's Order).
The Receiver filed a motion to have its receivership discharged (Motion #206-25) on March 11, 1996, together with an Application for an Order that the Bank be directed to pay the outstanding fees and expenses in conjunction with the operation of the Restaurant. (Motion #206-50). The Receiver also filed a preliminary Memorandum of Law (Motion #212). and Receiver's Report (Pleading #213). On March 31. 1996, the Bank filed a motion with the court for possession of the Restaurants. (MotionCT Page 6612#207).
On April 16, 1996, the court (Austin, J.) entered an interim order by agreement between the Receiver and the Bank, (AttachmentB) discharging the Receiver and allowing the Bank to take possession of the Restaurants and their contents, including inventory, so that the Bank could effectuate a sale of the Restaurants. The Bank in turn agreed to immediately transmit to the Receiver the sum of $79,000.00 to be utilized as an escrow to resolve outstanding tax obligations from the Restaurants' operations. The court agreed to schedule a trial upon the Receiver's Motion for Order of Payment.
Pursuant to a stipulation, the accountant was to provide:
 a. a listing of income and expenses of the receivership.
 b. a listing of the accounts payable at the commencement and termination of the receivership.
 c. a listing of the accounts receivable at the termination of the receivership.
The report of Blum, Shapiro Company, P.C. Litigation Consulting and Valuation Group, prepared by Allen Mandell, fulfilling this agreement was filed with the court in August of 1996. (Receiver's Exhibit #38, attached hereto as Attachment D).
In November of 1996, the trial, upon the Receiver's motions, was resumed and concluded.
In addition to the foregoing, several vendors have sought, and in some instances, have obtained permission of the court to sue the Receiver for their outstanding vendor bills. For the most part, those actions have been voluntarily placed on hold by the vendors pending a decision of this court upon the Receiver's motions.
DISCUSSION
The court finds that Prime was a court appointed receiver to manage the two restaurants and preserve the value of the property. It was to be paid a fee for its services and to pay all bills of vendors, salaries of employees, taxes and other obligations out of the proceeds of the business from the sale of CT Page 6613 food and drinks. Where necessary, the bank was to advance money for these purposes where the income from the business was insufficient to cover all expenses. Any profits over and above costs and Prime's fees were to go to the Bank. Any losses were to be suffered by the Bank.
The Receiver has now filed its accounting with the court for its fees, reimbursement of debts paid and money to pay outstanding bills. Such amounts to be paid by the Bank on whose behalf Prime undertook to manage the property during a time of acute distress where there was a serious possibility that the properties would be severely reduced in value due to the operation of McTeague's companies.
The Bank, has refused to pay and has filed an Objection to the Receiver's Motion for Payment which seeks to hold the Bank liable for all expenses and liabilities of the Restaurants. It claims that: (1) the law holds that the Bank is not responsible for paying said fees and expenses of the Receiver; (2) the Receiver's fees and attorney's fees are beyond the authority of this court's order and did not benefit the Receiver's estate; and (3) the procedure by which the Receiver is seeking damages is improper and denies the plaintiff due process.
A mere reading of the Bank's claims is sufficient to disclose that they have no merit. The fees and expenses are not those of the Receiver as claimed. They are the expenses incurred to preserve the assets of the Restaurants for the benefit of the Bank.
A receiver is an officer of the court appointed on behalf of all who may establish an interest in the property. HartfordFederal Savings and Loan Association v. Tucker, 196, Conn. 172, 178 (1985). The receiver appointed in a foreclosure action to take charge of a property holds the property as an arm of the court. Tucker v. American Insurance Company, 3 Conn. App. 397,398 (1984).
A receiver is in the same position as a "foreclosure sale committee" which is also deemed to be an "arm of the court." A foreclosure sale committee should not have to act at its own peril in undertaking its obligations. Our Appellate Court held that absent fraud or fault on the part of the committee, it should be compensated for its efforts and reimbursed for all its expenses associated with its acts in furtherance of the court's CT Page 6614 order. Hartford Federal Savings and Loan Association v. Tucker,13 Conn. App. 239, 250 (1988).
 "Basic principles of equity lead us to conclude that moneys expended to maintain and protect secured property pursuant to the trial court's authorization should be given priority over the encumbrances on that property. When a court authorizes the maintenance and protection of property in foreclosure, it does so for the benefit of the encumbrancors in order to preserve their security and the equity available to the owner. Surely, if instead of granting the plaintiff's motion, the court had appointed a receiver to maintain the property, that receiver would have been paid his expenses before any encumbrances are satisfied." Virginia Corporation v. Galanis, 223 Conn. 436 (1992).
Prime's fees for preserving the Bank's property for its benefit are certainly within the power of the court to award. As a court appointed receiver, Prime is entitled to a fee for its services.
The Receiver claimed outstanding fees in the amount of $63,140.69. The Blum, Shapiro Report adjusted the fee to $58,733.36 as a "documented amount." Prime agreed to accept this figure and the court will find that figure appropriate to be paid. The court finds payments of them appropriate because the services were necessary to resolve the books and the properties after the business shut down in January of 1996.
The court finds that the fees submitted for the period of January, 1996 through March, 1996 were justified as necessary. Prime testified that after the Harborview closed in January, 1996, it continued to expend a considerable amount of time and effort inspecting the property regularly, dealing with issues relating to the fire damage, employees, taxes, vendors and accounting through March 11, 1996. Accordingly, the court approves of the fees charged for this period.
As to its attorney's fees for bringing this action, the original court order specifically authorized payment of Prime's attorney's fees. This expense to the Receiver would not have been incurred had the Bank made payments as originally requested. The CT Page 6615 court finds the fees to be reasonable. The Receiver should not lose money once it has properly performed its function as an arm of the court in getting the Bank to fulfill its obligations.
Finally, the Bank suggests that Prime is claiming "damages" and that it has not used the proper procedure to do so. The foregoing is a misstatement of the issue. Prime is not seeking "damages." Prime was not required to submit a report in the format of Practice Book § 499, as suggested by the Bank. Practice Book § 499 applies to liquidation of a business not to a receiver appointed by the court in a foreclosure to maintain collateral. To claim that Prime is seeking "damages" is to entirely miss the point. Here the Receiver is complying with the court's order to preserve the assets of the Bank as best it can under all the difficult circumstances that existed, have all expenses and its fees paid by the Bank on whose behalf and for whose benefit it acted as an arm of the court. The bank is completely wrong to suggest that it can keep any profits, but that the Receiver absorb any losses. The court finds that the Receiver's Reports and Motion for Order of Payment are entirely appropriate in this case.
The court finds that Prime properly performed its function as receiver and is entitled to be reimbursed for expenses paid. It is to recover from the Bank bills still outstanding to be paid by Prime to the appropriate vendors. It is to recover from the Bank its Receiver's fees and expenses. The Bank is also ordered to pay Prime's legal fees set forth in the Order attached to this Memorandum of Decision.
D. Michael Hurley Judge Trial Referee